## STOKES v. AVILA.

(Supreme Court, Appellate Term, First Department.    March 22, 1916.)

LANDLORD AND TENANT ☞187(1)—LEASE—FRAUD—WAIVER.

A tenant, who rented a house at a summer resort for one year from July 1st, by lease providing that he was to take the premises as he found them and not call on the lessor for any repairs, and that $100 was to be deducted from the last payment of rent, to be applied to alterations, repairs, etc., and took possession and paid the first quarterly installment of rent September 1st, after having made an inspection of the heating plant, and on September 25th wrote, inquiring about an option for a year's extension of the lease, could not, after occupying the house four months, constituting the best part of the season, escape payment of the second installment of rent on the ground of misrepresentations by the lessor as

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to the condition of the heating plant; any such misrepresentations being waived by the conduct and delay of the tenant.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 770, 771, 774, 775; Dec. Dig. ☞187(1).]

Appeal from Municipal Court, Borough of Manhattan, Fifth District.

Action by William E. D. Stokes against Jose R. Avila. From a judgment for defendant, plaintiff appeals. Reversed, and judgment directed for plaintiff.

Argued February term, 1916, before LEHMAN, WEEKS, and DELEHANTY, JJ.

Hastings & Gleason, of New York City (Edward L. Dennis, of New York City, of counsel), for appellant.

Pressinger & Newcombe, of New York City (Henri Schwob, of New York City, of counsel), for respondent.

WEEKS, J. The defendant rented from plaintiff his summer home at Long Branch, N. J., known as "The Nunnery," together with the furniture and furnishings contained therein, for the term of one year from July 1, 1915, at a yearly rental of $2,000, payable in installments of $500 each on the 1st days of September, November, January, and April, under a written lease whereby the tenant covenanted to "keep the plumbing work, pipes, glass, and the premises generally in repair." The lease also contained the following clauses:

"It is further understood and agreed that the party of the second part is to take the premises in its present condition, and will not call upon the party of the first part for any repairs, either to the premises or furniture or furnishings contained therein. It is further understood and agreed that the party of the first part will allow the party of the second part the sum of $100, to be deducted from the last payment of rent due April 1, 1916, said sum to be applied to any alterations, repairs, additions to the premises, furniture and furnishings contained therein."

The defendant went into possession and paid the installment of rent due September 1, 1915, but resists the payment of the installment due November 1, 1915, for which this action is brought, upon the ground that he was induced to sign the lease, relying on certain representations made by the landlord "that the house on said premises was properly constructed and in thorough repair, and that the furnace and heating apparatus was in good condition, and that same would heat said house thoroughly and comfortably," which representations were false and untrue, and—

"that said premises were unfit for the purpose of a residence, in that the furnace and heating apparatus were defective and useless; that said defects were latent, and were unknown and were undiscoverable by the defendant at the time said lease was signed by defendant; that by reason of said defects of said furnace and heating apparatus it was impossible to heat said house, and the same became uninhabitable and dangerous to the health and well-being of defendant and his family; that plaintiff after notice did nothing to correct the condition of said house, and defendant was obliged to and did quit and leave said house, and did surrender same to plaintiff."

Before signing the lease the defendant and his wife visited the premises twice. They went into possession on July 7, 1915, and remained in the premises until the end of October. No evidence was given of the condition of the furnaces prior to defendant's removing from the house, except that they were "not in good condition," and "when they noticed that they were out of order they tried to see how much it would cost"; but a witness who had visited the premises on December 13, 1915, the day before the trial, was permitted to testify that the furnaces were rusty, that three of the five furnaces did not have the flues or smokestacks connected, and that there were only two floor registers, both of which were connected with the furnace. It appeared, however, that there were fireplaces in each room and registers near the ceiling, which he could not state were not connected or could not have been connected with the furnaces.

The defendant testified that he first noticed that the furnaces were not in good condition at the end of August, when he made an inspection with a view to getting an extension for another year, and on September 25, 1915, he wrote plaintiff as follows:

"Under our agreement I took the premises "in its present condition,' giving up the right to call upon you for any repairs, and you allowed me to invest $100 from the last rental payment in making 'any alterations, repairs, additions to the premises, furniture and furnishings contained therein.' * * * I am not obliged to make in your property all the repairs it wants, or to put 'everything in order,' as it would cost much over $100 *only* to repair the destroyed furnaces for heating it. According to the clear terms of our contract, as above stated, I took 'the premises in its present condition.' * * * I am about to start in these premises a small poultry farm, * * * to which I consider myself entitled by our contract, for only the establishment of an *extrahazardous* business requires the written consent of the landlord; but I wish to avoid any further trouble, and prefer to tell you about it, hoping you would not have any objection to make. Kindly let me know if to grant me an option for one year extension of the lease would meet or not any inconvenience on your side."

The claim of a constructive eviction seems to have been abandoned, probably because no wrongful act of the landlord could be shown to have occurred after the beginning of the term (Cox v. Cryder, 168 App. Div. 624, 154 N. Y. Supp. 454), and the tenant had failed to move promptly (Butler v. Carillo, 88 N. Y. Supp. 941; Seaboard Realty Co. v. Fuller, 33 Misc. Rep. 109, 67 N. Y. Supp. 146; Fox v. Murdock, 58 Misc. Rep. 207, 210, 109 N. Y. Supp. 108); but evidence was given to support the allegation of false representations as to the condition of the heating plant, which, however, was denied by the landlord, and the case was decided by the learned justice in the court below solely upon the basis of false representations and upon the authority of Ash v. Meeks, 134 App. Div. 154, 118 N. Y. Supp. 821, which is clearly distinguishable from the present case.

In Ash v. Meeks, supra, certain of the defects, such as the overflowing cesspool and the leaking roof, could not be discovered upon inspection, but would only become apparent when the premises were used, and as to the heating system the tenant was not only assured that certain repairs were necessary and would be made, but it was falsely represented before the lease was signed that the repairs had

actually been made. The landlord after notice refused to make the repairs, and the tenant having contracted illness due to the existing conditions, moved on the advice of her physician, having occupied the premises only 23 days.

This prompt disaffirmance of the lease was very different from the conduct of the defendant herein. In this case there was no promise to repair, but, on the contrary, the tenant agreed to "take the premises in its present condition and not call upon the landlord for any repairs," and was made an allowance for "alterations, repairs, and additions." The tenant had made two inspections of the premises, and the nonexistence of floor radiators and the absence of connecting pipes from the furnaces were not latent defects, but were easily discoverable, and were actually discovered by the tenant in August, and an estimate obtained for the necessary repairs, after which he paid the rent due September 1st, and on September 25th applied for an option for a renewal of the lease, making no claim of false representations, and no suggestion of disaffirmance or dissatisfaction, and remained another month, and until just before the next rent day, before vacating the premises.

There is no evidence that the landlord was ever asked to remedy the alleged defects, or that any notice was ever given that the tenant would move unless the defects were remedied, or that the landlord was charged with making any false representations until after suit was brought. The leased premises are located at a fashionable summer resort, and defendant occupied the same nearly four months and until the end of the summer season, having paid for one-third of the year, the most desirable and valuable part, a sum equal only to one-quarter of the annual rent reserved.

I am unable to agree with the learned justice below that "the equities of this case are with the defendant," because it seems to me that the suggestion of the defendant that he was entitled to turn a handsome summer residence into a poultry farm without the written consent of his landlord, because that was not an *extrahazardous* business, was only a preliminary step intended to assist him in securing the use and occupation of a home for the summer season without the payment of any rent beyond the $500 already paid. Whatever may be the equities as between the parties, their rights must be determined according to well-established legal principles, and defendant's failure to act promptly upon his discovery of the alleged fraud is fatal to the defense which he has interposed.

In a similar case, where it was claimed that the landlord had made false representations as to the condition and heating qualities of a furnace, Haight, J., said in Pryor v. Foster, 130 N. Y. 171, 175, 29 N. E. 123:

"The rule is that, where a fraud is perpetrated in procuring the execution of a contract, the party defrauded has an election of remedies. He may, after knowledge of the fraud, rescind the contract and recover back that which he has parted with, or he may continue to perform on his part and maintain an action for such damages as he has sustained by reason of the fraud. Allaire v. Whitney, 1 Hill, 484; Id., 4 Denio, 554, affirmed 1 N. Y. 305; Miller v. Barber, 66 N. Y. 558. If he rescind, he must do so immediately upon the

discovery of the fraud; and if he continue the use and occupation of the property received under the contract, he will be deemed to have elected to affirm it. Strong v. Strong, 102 N. Y. 69, 5 N. E. 799; Schiffer v. Dietz, 83 N. Y. 300."

Applying this rule to the case under consideration, it is manifest that by continuing in possession after the discovery of the falsity of the alleged representations the tenant accepted the benefit of the contract and thereby elected to affirm the lease, and, no counterclaim being pleaded, the landlord was entitled to recover.

Having reached that conclusion, it is unnecessary to consider the exceptions taken by appellant to the admission or exclusion of evidence, and, as none of the exceptions taken by respondent in any way affect this aspect of the case, the judgment appealed from should be reversed, with $30 costs, and judgment directed in favor of plaintiff for $500, with interest from November 1, 1915, and proper costs in the court below.

DELEHANTY, J., concurs.　LEHMAN, J., concurs in the result.